IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH McATEER, administrator of the estate of James McAteer | : : : | CIVIL ACTION |
| v. | : : | |
| THE UNITED STATES OF AMERICA | : | NO. 23-1335 |

**MEMORANDUM**

Padova, J.                                                                                                                 August 28, 2024

      In this Federal Tort Claims Act ("FTCA") action, Plaintiff Joseph McAteer, administrator of the estate of James McAteer seeks damages arising from James McAteer's death by suicide while detained at the Federal Detention Center in Philadelphia ("FDC Philadelphia"). The Government has filed a Motion to Dismiss and/or for Summary Judgment with respect to Plaintiff's claims based on the May 4, 2020 decision to assign James McAteer to a single cell, which purportedly fall within the discretionary function exception to the FTCA.

**I.    BACKGROUND**[1]

      James McAteer died by suicide on May 5, 2020, while detained at FDC Philadelphia. (Psychological Reconstruction (Ex. E)[2] at 1.) When McAteer arrived at FDC Philadelphia in

---

[1] As further discussed below, the Government's Motion presents a factual challenge to our subject matter jurisdiction. Accordingly, even if we construe the instant Motion as a Motion to Dismiss, rather than for Summary Judgment, we are not "confined to the allegations in the complaint" but "can look beyond the pleadings to decide factual matters relating to jurisdiction." Cestonara v. United States, 211 F.3d 749, 752 (3d Cir. 2000) (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)). Furthermore, the relevant facts are not in dispute. In its Reply, the Government stipulates for purposes of the Motion to Plaintiff's Statement of Additional Material Facts with one exception, which is not relevant here. (See Gov't Reply at 2 n.1.)

[2] Except as otherwise noted, all exhibits referenced are those attached to the Government's Motion to Dismiss and/or for Summary Judgment.

March of 2020, his history of serious mental health concerns, including self-harm and suicide attempts, was already known to prison psychological staff. (<u>Id.</u> at 2-4; Chad Brinkley Dep. (Ex. B) at 109-10.) By his own estimation, McAteer had attempted to kill himself 30-40 times over the course of his life, including once in 2012 when he had previously been detained at FDC Philadelphia. (4/30/20 Suicide Risk Assessment (Ex. A) at 12 of 24; Ex. E at 3.) Altogether, McAteer required suicide watch on seven occasions while in Bureau of Prisons ("BOP") custody and was evaluated for risk of suicide 16 times, including five times in the eight weeks before his death. (Ex. E at 3.)

Upon his arrival at FDC Philadelphia on March 12, 2020, McAteer was housed on 7 South, the facility's mental health unit. (<u>Id.</u> at 4.) 7 South is a single-tiered unit, smaller than others in the prison, with an in-unit psychologist and special treatment groups. (Ex. B at 111.) However, on March 24th, McAteer was removed from the mental health unit and placed in general population housing. (Ex. E at 4.) Between March 24th and April 30th, McAteer reported thoughts of suicide or self-harm to prison staff on at least four occasions. (<u>Id.</u>)

On April 30th, McAteer was placed on suicide watch following a conversation with staff psychologist Dr. Kristin Conlon during which he scratched himself with a piece of plastic and expressed suicidal intent. (Ex. E at 4.) Suicide watch is a status for inmates at imminent risk of self-harm, which requires that they be monitored at all times, seen by a psychologist daily, and permitted limited property to minimize the risk of self-harm. (Ex. B at 83-84.) The next morning, McAteer was reevaluated by Dr. Conlon, who determined that suicide watch was no longer warranted and moved McAteer to psychological observation status. (Ex. E at 4.) Psychological observation is a status for inmates not at imminent risk of self-harm, but who nonetheless require heightened observation and more regular contact with a psychologist. (Ex. B at 85-86.)

On the morning of May 4th, McAteer began crying, pressing the duress alarm in his cell, and requesting to speak with a psychologist. (Ex. E at 5.) However, when Dr. Conlon arrived to speak with him, McAteer stated that he was ready to return to the general population and denied suicidal intent. (Id.) Following this conversation, Dr. Conlon removed McAteer from psychological observation status. (Id.) Dr. Conlon recommended that McAteer have a cellmate if an appropriate cellmate could be found, although she noted prior difficulties with identifying a cellmate for McAteer due to his "abusiveness" and uncomfortable behavior. (Ex. A at 23 of 24.) Indeed, Unit Manager Christopher Cole reported that the inmate identified to share a cell with McAteer that day refused to accept him. (Christopher Cole Decl. (Ex. C) ¶ 8.) Unit Manager Cole decided to place McAteer in cell 430 without a cellmate until the assignment could be revisited, if necessary, the next day. (Ex. C ¶¶ 10-11.)

The overnight guard assigned to McAteer's unit that night interacted with him four times over the course of her 10:00 p.m. to 6:00 a.m. shift. (Ex. E at 5.) She reported that in the early morning hours of May 5th, McAteer's demeanor took a turn. (Id.) He became angry and demanding and began repeatedly pressing the duress alarm in his cell and asking to speak to a psychologist. (Id.) On May 5th, between the hours of 6:20 and 6:24 a.m., McAteer died by tying a ligature around his neck. (Id. at 6; Gov't Stmt. Facts ¶ 17; Pl. Stmt. Facts ¶ 22.)

The Amended Complaint asserts three claims under Pennsylvania law pursuant to the FTCA. Count I is a negligence claim, Count II is a wrongful death claim, and Count III is a survival action. These claims are premised on numerous allegations that BOP medical providers and staff failed to properly diagnose and care for McAteer by, inter alia, failing to keep him on a heightened observation status, monitor his symptoms, provide appropriate medications, communicate his needs to other BOP staff, or ensure that he was sufficiently supervised. (See Am.

3

Compl. ¶ 49.) The instant Motion only concerns Plaintiff's claims to the extent they are based on the May 4, 2020 decision to assign McAteer to a single cell, and does not concern the other negligent conduct alleged.[3]

## II. LEGAL STANDARD

In its Motion to Dismiss and/or for Summary Judgment, the Government contends that we lack jurisdiction over Plaintiff's claims to the extent that they fall within the discretionary function exception to the FTCA. "A challenge to the court's subject-matter jurisdiction is properly brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure on a motion to dismiss." Menkin v. United States, 99 F. Supp. 3d 577, 578 n.2 (E.D. Pa. 2015) (citing 10 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2713); see also Williams v. U.S. Army Corps of Eng's, Civ. A. No. 06-834, 2007 WL 2261559, at *5 (D.N.J. Aug. 2, 2007) ("Claims under § 2680 [regarding FTCA exceptions] are appropriately styled as lack of subject matter jurisdiction claims under Rule 12(b)(1)." (citing Gibson v. United States, 457 F.2d 1391, 1392 (3d Cir. 1972); Mundy v. United States, 983 F.2d 950, 952 (2d Cir. 1993))), aff'd sub nom. Williams v. United States, 321 F. App'x 129 (3d Cir. 2009). Moreover, neither party contends that the jurisdictional inquiry before us is so entwined with the merits of Plaintiff's claims that the application of Rule 12(b)(1) is inappropriate. See Davis v. Wells Fargo, 824 F.3d 333, 348 (3d Cir. 2016) (cautioning against allowing a 12(b)(1) motion "to be turned into an attack on the merits"). Accordingly, we construe the Government's Motion as a Motion to Dismiss pursuant to Rule 12(b)(1).

---

[3] The Government also argues in its Motion that any claims based on 1) where cutdown tools to prevent hangings should be stored (e.g., whether they should be kept in a locker, carried by guards, etc.); and 2) the recommendations about staff accountability and training in the suicide reconstruction report (see Ex. E at 9 ¶¶ 7-8) are barred by the discretionary function exception. In his Response, Plaintiff clarifies that he does not intend to assert claims on either of these grounds. (Pl.'s Resp. at 20-21.) Thus, the Motion is moot insofar as it seeks dismissal of such claims.

When a party contests our subject matter jurisdiction pursuant to Rule 12(b)(1), we must first "determine whether the challenge is a facial attack or a factual attack." GBForefront, L.P. v. Forefront Mgmt. Grp., LLC, 888 F.3d 29, 35 (3d Cir. 2018) (citation omitted).  A facial attack "considers a claim on its face and asserts that it is insufficient to invoke [the] subject matter jurisdiction of the court," whereas a factual attack contends that "the facts of the case . . . do not support the asserted jurisdiction."  Id. (second alteration in original) (quotation omitted).  Here, the Government raises a factual challenge to our jurisdiction, and therefore we are "not confined to allegations in the plaintiff's complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction."  Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997) (citing Mortensen v. First Fed. Sav. & Loan Ass'n., 549 F.2d 884, 891-92 (3d Cir. 1977)).  Although plaintiffs have the burden of showing that their claims fall within the scope of the FTCA, the Government has the burden of proving that the discretionary function exception applies.  In re Orthopedic Bone Screw Prod. Liab. Litig., 264 F.3d 344, 361 (3d Cir. 2001) (citations omitted); Cestonara v. United States, 211 F.3d 749, 756 n.5 (3d Cir. 2000) (quotations and citations omitted).  We must dismiss any claims over which we lack subject matter jurisdiction. See Fed. R. Civ. P. 12(h)(3).

### III.    DISCUSSION

"[T]he federal government is immune from suit save as it consents to be sued." Antol v. Perry, 82 F.3d 1291, 1296 (3d Cir. 1996) (quotation omitted).  Because sovereign immunity is jurisdictional, the terms of any such consent strictly limit the jurisdiction of the courts.  F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)) (citation omitted).  "The FTCA waives the federal government's sovereign immunity with respect to tort claims for money damages."  Baer v. United States, 722 F.3d 168, 172 (3d Cir. 2013) (citing

5

28 U.S.C. § 1346(b)(1)).  There are, however, exceptions to this waiver.  The discretionary function exception provides that the United States is not subject to suit "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).  Thus, we lack subject matter jurisdiction over FTCA claims that seek to impose liability based on discretionary functions.  Baer, 722 F.3d 172 (citing 28 U.S.C. § 1346(b)(1)).

The discretionary function exception applies to acts that involve "an element of judgment or choice." United States v. Gaubert, 499 U.S. 315, 322 (1991) (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1988)) (add'l citation omitted).  To determine whether the exception applies, we must first determine whether a "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Cestonaro, 211 F.3d at 753 (quoting Berkovitz, 486 U.S. at 536).  If so, the function is not discretionary because the employee cannot exercise judgment or choice; rather, she must follow the prescribed course.  Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536).

If there is no applicable statute, regulation, or policy, we next consider whether the challenged conduct "is of the kind that the discretionary function exception was designed to shield." Cestonaro, 211 F.3d at 753 (quoting Berkovitz, 486 U.S. at 536).  The focus of this second step is not the identity of the government actor or their subjective intent in taking the challenged actions, but the nature of the actions taken, and whether they are "susceptible to policy analysis." Id. (quoting Gaubert, 499 U.S. 325).  "[T]here must be a rational nexus between the Government's decision and social, economic, and political concerns" such that the decision is "grounded in the

policy of the regulatory regime." S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329, 336 (3d Cir. 2012) (quotations omitted).

As a preliminary matter, we must identify the challenged conduct. Cestonaro, 211 F.3d at 753 (citing Rosebush v. United States, 119 F.3d 438, 441 (6th Cir. 1997)). We reiterate that the instant Motion does not concern Dr. Conlon's determination that McAteer was stable enough to be removed from psychological observation status on the day before his death, or other allegedly negligent care decisions by BOP doctors. The only conduct at issue is the May 4, 2020 decision to assign McAteer to a single cell, which the Government contends is a discretionary function and therefore cannot be a basis for FTCA liability.

It is well-established that BOP housing and cellmate assignments are discretionary functions exempted from FTCA liability. Rinaldi v. United States, 904 F.3d 257, 273 (3d Cir. 2018) (agreeing with the Courts of Appeals for the First, Sixth, Seventh, Eighth, and Eleventh Circuits that such assignments meet the test for the discretionary function exception). While 18 U.S.C. § 4042(a)(2) charges the BOP with providing "suitable quarters" and providing "for the safekeeping, care, and subsistence" of federal detainees, id., the United States Court of Appeals for the Third Circuit has explained that "neither that provision nor any other 'federal statute, regulation or policy' can be said to 'specifically prescribe[ ] a course of action' for such assignments that BOP officials must follow." Rinaldi, 904 F.3d at 273 (alteration in original) (quoting Mitchell v. United States, 225 F.3d 361, 363 (3d Cir. 2000)). The Third Circuit has further concluded that cellmate and housing assignments are the kind of discretionary functions the exception was designed to shield because they involve judgments about maintaining internal order, discipline, and security. Id. at 274 (quotations omitted).

Nonetheless, Plaintiff asserts that we should deny the instant Motion because the decision to place McAteer in a cell without a cellmate ("single-celling") was not "a mere housing decision" but a "medical decision" subject to a professional standard of care. (Pl.'s Resp. at 12.)  Plaintiff asserts that, given the BOP's knowledge of the correlation between single-celling and suicide risk, as well as McAteer's personal history of mental health issues and self-harm, the Government has not met its burden of showing that the discretionary function exception applies.

    A.  <u>Specifically Prescribed Course of Action</u>

Our first step is to determine whether a "a federal statute, regulation, or policy specifically prescribe[d] a course of action" with respect to McAteer's cell assignment. <u>Cestonaro</u>, 211 F.3d at 753 (quotation omitted).  As we previously noted, the Third Circuit has held that the BOP's mandate to provide "suitable quarters" and "provide for the protection" of detainees pursuant to 18 U.S.C. § 4042(a) does not prescribe a specific course of action. <u>Rinaldi</u>, 904 F.3d at 273 (quotation omitted).  Moreover, the uncontested evidence of record shows that there was no regulation or policy in place at FDC Philadelphia at the time of McAteer's death with respect to single-celling.  Dr. Chad Brinkley, then Chief Psychologist at FDC Philadelphia, testified that there was no "specific procedure to clear people to house them alone" and no requirement "for approval for an inmate to be housed alone." (Ex. B at 73, 81.)  Unit Manager Cole likewise stated in his declaration that "[t]here is no statute, regulation, rule, or policy that mandates specifically how to assign an inmate to a cell or how to determine cellmates or cellmate compatibility."[4] (Ex. C ¶ 5.)

---

[4] Plaintiff acknowledges that it was Unit Manager Cole who "determined to place Mr. McAteer in . . . a single cell." (Pl. Stmt. Facts ¶ 18.)

Nonetheless, Plaintiff asserts that two directives eliminated the BOP's discretion in this case. First, he relies upon Pennsylvania's Mental Health Procedures Act ("MHPA"), 50 Pa. Stat. Ann. §§ 7101-7503, "which requires mental health professionals and institutions to avoid willful misconduct or gross negligence in the treatment of mental health patients, and imposes civil liability for a breach of that duty." Leight v. Univ. of Pittsburgh Physicians, 243 A.3d 126, 130 (Pa. 2020) (citation omitted). Plaintiff argues that BOP staff had no discretion to assign McAteer a single cell to the extent that their decision constituted willful misconduct or gross negligence in violation of the MHPA.

Plaintiff points to no authority within this Circuit for the proposition that state law can prescribe a course of action for purposes of the discretionary function exception. Moreover, the Ninth and Tenth Circuits have reached the opposite conclusion, reasoning that state law cannot abrogate federal immunity, and that the question of whether a federal actor violated a state duty of care must come *after* the question of whether immunity has been waived. See Miller v. United States, 992 F.3d 878, 886 n.3 (9th Cir. 2021) ("[A] plaintiff cannot rely on the premise that state law specifically prescribes a course of action for an employee to follow, except perhaps to the extent that a *federal* policy incorporating state tort law limits the discretion of federal employees within the meaning of the FTCA." (internal quotations omitted)); Sydnes v. United States, 523 F.3d 1179, 1184 (10th Cir. 2008) ("[W]e reach the question whether the federal government is liable for breaching some duty of care under state law if (and only if) we can first find an applicable waiver of sovereign immunity by the federal government itself." (citation omitted)); see also Berkovitz, 486 U.S. at 536 ("[T]he discretionary function exception will not apply when a *federal* statute, regulation, or policy specifically prescribes a course of action for an employee to follow." (emphasis added)).

Plaintiff relies on Stout v. United States, 721 F. App'x 462 (6th Cir. 2018), in which the Sixth Circuit held that federal actors lacked discretion for purposes of the discretionary function exception as to the reporting of sexual assaults in hospitals, which Ohio law and federal directives both required. Id. at 469-70. The Stout court concluded that "to the extent that the United States had a duty grounded in agency directives or state law, the discretionary function exception does not apply to such duty." Id. Stout is distinguishable from the present case, however, because in Stout, a *federal* directive required agency actors to comply with the pertinent state law. See id. (citation omitted) (explaining that an agency directive instructed employees to "comply with their own state laws for reporting abuse and neglect"); see also Miller, 992 F.3d at 886 n.3 (opining that state law cannot limit the discretion of federal actors "except perhaps to the extent that a *federal* policy incorporat[es] state tort law"). Moreover, Stout involved a highly specific mandate—that hospitals report sexual assaults. 721 F. App'x at 469-70. In contrast, the MHPA imposes a general duty to avoid willful misconduct and gross negligence. This generalized duty, like the duty to provide "suitable quarters," 18 U.S.C. § 4042(a)(2), "can[not] be said to specifically prescribe[ ] a course of action for [housing and cellmate] assignments that BOP officials must follow." Rinaldi, 904 F.3d at 273 (second alteration in original) (quotation omitted).

Plaintiff also argues that reports by the Department of Justice Office of the Inspector General from 2017 and 2024 evidence a BOP policy of limiting single-celling due to increased risk of suicide. See Dep't Just. Off. Inspector Gen., Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness (2017), https://oig.justice.gov/reports/2017/e1705.pdf [https://perma.cc/DRB3-R45T] ("2017 OIG Report"); Dep't Just. Off. Inspector Gen., Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions (2024), https://oig.justice.gov/sites/default/files/reports/24-041.pdf [https://perma.cc/V3AC-RTSD]

("2024 OIG Report"). The 2017 OIG Report recommends that the BOP "[e]stablish in policy the circumstances that warrant the placement of inmates in single-cell confinement," 2017 OIG Report at 65, a recommendation that remained open as of February 2024. See 2024 OIG Report at 21. The 2024 OIG Report states that "[n]umerous BOP documents, including Central Office memoranda to Wardens and Psychological Reconstruction Reports, [have] recommended against single-celling and indicated that single-celling increases the risks of inmate suicide." Id. at 19. It also notes that during the COVID-19 pandemic, when McAteer's suicide occurred, "BOP Central Office continued to warn institutions via memoranda about the risks of suicide associated with single-celling inmates." Id. at 22. However, these recommendation and warnings did not result in a policy that "specifically prescribe[d] a course of action for an employee to follow." Berkovitz, 486 U.S. at 536; cf. Thieme v. United States, Civ. A. No. 21-682, 2023 WL 8271766, at *4-5 (D.N.J. Nov. 30, 2023) (concluding that BOP's COVID-19 policies "replete with qualifying language indicating 'recommended' 'best practice[s]' of what prisons should 'ideally' or 'should be' doing" did not bar the application of the discretionary function exception). If anything, the OIG Reports underscore the lack of such a mandate, noting in 2024 "the absence of a national single-celling policy." 2024 OIG Report at 23.

We conclude that, based on the evidence discussed above, the Government has met its burden of showing that no statute, regulation, or policy specifically prescribed a course of action for Unit Manager Cole to follow in assigning McAteer to a single cell. Section 4042(a) does not remove the BOP's discretion in that regard. See Rinaldi, 904 F.3d at 273 (quotation omitted). Nor, we conclude, do the MHPA or the recommendations and warnings in the 2017 and 2024 OIG Reports. Accordingly, we proceed to step two of the discretionary function test.

11

B. <u>Conduct of the Kind the Discretionary Function Exception was Designed to Shield</u>

Step two of the discretionary function test requires us to determine whether the assignment of McAteer to a single cell is the kind of conduct "that the discretionary function exception was designed to shield." <u>Cestonaro</u>, 211 F.3d at 753 (quoting <u>Berkovitz</u>, 486 U.S. at 536). If it is, the cell assignment "constitutes the exercise of protected discretion, and the United States is immune from suit" with respect to it. <u>Id.</u>

In <u>Rinaldi</u>, the Third Circuit determined that "housing and cellmate assignments are 'of the kind that the discretionary function exception was designed to shield.'" 904 F.3d at 274 (quoting <u>Mitchell</u>, 225 F.3d at 363). This is because "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators" who "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." <u>Id.</u> at 273-74 (first quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 350 (1981), then quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979)). It remains true even when an inmate's health and safety are central considerations. See <u>Ruiz v. United States</u>, 664 F. App'x 130, 133 (3d Cir. 2016) (explaining that assigning inmate a gang member cellmate and later an HIV-positive cellmate was the type of judgment "the discretionary function exception was designed to shield"); <u>Thrower v. United States</u>, 528 F. App'x 108, 111 (3d Cir. 2013) (concluding that assigning inmate a violent cellmate was discretionary because "a judgment as to the best way to protect prisoners from attack by others is of the kind that the discretionary function exception was designed to shield." (quotation and citation omitted)); <u>Donaldson v. United States</u>, 281 F. App'x 75, 77-78 (3d Cir. 2008) (collecting cases concluding that the BOP has discretion in determining how best to protect inmates from one another, including with respect to cell assignments); cf. <u>Brown v. United States</u>, Civ. A. No. 22-

404, 2023 WL 2632811, at *11-12 (M.D. Pa. Mar. 24, 2023) (holding that "the development, implementation, and management of [COVID-19] protocols were grounded in public policy considerations" and were protected by the discretionary function exception (citations omitted)).

Here, the record evidence reinforces the conclusion that McAteer's cell assignment implicated the kind of safety and security concerns that animated the holding in <u>Rinaldi</u>. The position description for Unit Managers states that they have "total responsibility" for safety and security procedures as well as "assignment of living quarters" within their unit. (Unit Manager Position Description (Ex. D) at 3 of 8.) Unit Manager Cole states in his declaration that he uses "correctional judgment" in making cell and cellmate assignments, involving considerations such as the safety of staff and inmates, escape risk, staffing levels, cell availability, and inmate compatibility. (Ex. C ¶¶ 5-6.) Dr. Brinkley testified at his deposition that housing assignments may also involve considerations of an inmate's care level, history, current symptoms and, indeed, their risk of harming themself or others. (Ex. B at 69, 72, 74-75, 77.) With respect to McAteer's assignment specifically, Unit Manager Cole states that he was aware of the recommendation that McAteer have a cellmate, but that "the inmate in the cell with space to house McAteer refused to accept [him]" raising the risk that "a hostile cellmate would physically harm Mr. McAteer." (Ex. C ¶¶ 8-9.) Thus, Unit Manager Cole had to balance at least two conflicting considerations regarding McAteer's safety, as well as pragmatic concerns such as cell and cellmate availability. Unit Manager Cole also states that he decided to assign McAteer to a cell "in a high traffic area" "within sight and hearing of the guard officer's station," intending to re-evaluate the assignment the next day if necessary. (<u>Id.</u> ¶¶ 10-14.) We conclude that this determination, involving competing concerns about safety, security, and allocation of resources, is "susceptible to policy

analysis and therefore enjoy[s] the protection of the discretionary function exception." Cestonaro, 211 F.3d at 755 (citing Gaubert, 499 U.S. at 322-23).

Plaintiff argues that the decision to place McAteer in a single cell does not fall within the discretionary function exception because "medical decisions by government doctors providing medical care are not considered the exercise of a discretionary function within the meaning of the [FTCA]." Surratt v. United States, 582 F. Supp. 692, 700 (N.D. Ill. 1984) (citing Beins v. United States, 695 F.2d 591, 614-15 & n.31 (D.C. Cir. 1982) (Robinson, C.J., concurring)). Plaintiff does not explain, however, why this principle should apply to a prison housing assignment made by non-medical staff. Unlike discretionary functions, "medical decisions do not involve any consideration of public interests or policy," but instead "rest upon medically-significant facts, medical knowledge and skill, and medical phenomena." Beins, 695 F.2d at 614 (Robinson, C.J., concurring). The authority on which Plaintiff relies serves to reinforce this distinction.[5] See Rise v. United States, 630 F.2d 1068, 1072 (5th Cir. 1980) (concluding that army doctor's negligent referral of patient was not a discretionary function); Keir v. United States, 853 F.2d 398, 409 (6th Cir. 1988) (concluding that army doctor's failure to follow existing protocol was not discretionary, whereas failure to implement additional safeguards was); Fang v. United States, 140 F.3d 1238,

---

[5] Plaintiff also relies upon the report of his expert, Dr. Alan A. Abrams, who opines, based on his training and clinical experience in psychiatry, that the decision to place McAteer in a single cell "grossly deviated from the standard of care." (Pl. Resp. Ex. A at 125, 133.) Abrams links the decision to assign McAteer to a single cell to the "distaste" of FDC clinicians. (Id. at 125.) He points to the clinicians' testimony that they were aware of the risk single-celling posed and asserts that they should have left McAteer on psychological observation or suicide watch status until a cellmate could be guaranteed. (Id.) Abrams does not reconcile these conclusions with the undisputed fact that the decision to place McAteer in a single cell was not made by the clinicians, who in fact recommended that McAteer be assigned a cellmate. Rather, he appears to conflate that decision with the decision to remove McAteer from psychological observation status, which is not at issue in this Motion.

1242 (9th Cir. 1998) (explaining that applying a splint, administering CPR, or transporting a patient are not discretionary functions; whereas decisions about EMT staffing and provisioning in national parks are); Christopher v. United States, 237 F. Supp. 787, 795, 799 (E.D. Pa. 1965) (concluding that government surgeon's decision to insert gauze into a patient's spinal canal was not a discretionary function). Indeed, these cases illustrate how courts must carefully distinguish between medical care and related non-medical discretionary functions. Carefully distinguishing those matters here, we conclude that McAteer's cell assignment by Unit Manager Cole was not a medical decision and that the rule that medical decisions are not discretionary functions does not apply.

Plaintiff also relies on Abunabba for the proposition that "where the Government is aware of a specific risk and responding to that risk would only require the Government to take garden-variety remedial steps, the discretionary function exception does not apply." 676 F.3d at 338. Plaintiff asserts based on the OIG Reports that the BOP was aware of a specific risk of inmate suicide posed by single-celling at the time of McAteer's death. Nonetheless, this proposition is limited to situations where "eliminating the danger *would not implicate policy* but would involve only garden-variety remedial measures." Id. at 340 (emphasis added). Abunabba itself involved a claim that the National Park Service failed to adequately warn visitors to Buck Island Reef National Monument of the danger of barracudas. Id. at 330. The Third Circuit agreed with the district court that the discretionary function exception applied, depriving the court of subject matter jurisdiction. Id. at 330. As the Abunabba court concluded, responding to specific known risks requiring only "garden-variety action, such as putting up a rail or installing additional lighting" is not discretionary. Id. at 342. In contrast, functions like determining the necessity or content of warning signs in national parks *are* discretionary because they involve significant policy

15

judgments about how best to balance safety with minimal intrusion on natural landscapes. Id. at 335-336, 342. As we concluded above, the decision to assign McAteer to a single cell also involved significant policy judgments, implicating individual safety, institutional security, and allocation of resources. In spite of its warnings, the 2024 OIG Report observes that "[t]here may be security and logistics-related circumstances in which single-celling is unavoidable." 2024 OIG Report at 88. McAteer's own circumstances, including the available cellmate who refused to cell with him and difficulties with prior cellmates generally, illustrate that his cell assignment required judgment and choice, not "garden-variety action." Abunabba, 676 F.3d at 342. Thus, we conclude that it falls within the discretionary function exception.

### IV. CONCLUSION

For the foregoing reasons, we conclude that the Government has met its burden of proving that the discretionary function exception to the FTCA applies to the placement of McAteer in a single cell. Accordingly, we lack subject matter jurisdiction over Plaintiff's claims based on McAteer's single-celling and we dismiss each of Plaintiff's claims insofar as they are based on that conduct. Plaintiff's claims will proceed exclusively to the extent they are based on the other negligent conduct alleged. An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.
_____
John R. Padova, J.